LEO D. PLOTKIN (CA SBN 101893)
CA SBN 101893
(Admitted in *Pro Hac Vice*)
lplotkin@lsl-la.com
LEVY, SMALL & LALLAS
A Partnership Including Professional Corporations
815 Moraga Drive
Los Angeles, California 90049-1633
Telephone: 310-471-3000
Facsimile: 310-471-7990

CHRISTOPHER J. KAYSER
OSB No. 984244
cjkayser@larkinsvacura.com
LARKINS VACURA, LLP
621 SW Morrison St., Suite 1450
Portland, Oregon 97205
Telephone: 503-222-4424
Facsimile: 503-827-7600

Attorneys for Secured Creditor
Textron Financial Corporation

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>TEUFEL NURSERY, INC.,<br><br>　　Debtor-in-Possession | Case No. 09-34880-elp11<br><br>Chapter 11<br><br>**OPPOSITION OF SECURED CREDITOR TEXTRON FINANCIAL CORPORATION TO DEBTOR'S MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL**<br><br>The Honorable Elizabeth L. Perris<br><br>Date:　August 25, 2009<br>Time:　11:00 a.m.<br>Courtroom: 1 |

1.  **INTRODUCTION**

The Motion for Interim Order Authorizing Use of Cash Collateral (the "Motion") filed by Debtor and Debtor-in-Possession Teufel Nursery, Inc. ("Debtor") must be denied because:

- Secured Creditor Textron Financial Corporation, through one of its operating divisions, Systran Financial Services Corporation ("Textron"), has a security interest in essentially all of Debtor's personal property assets to secure debt of approximately $5.4 million;

- Textron is not adequately protected by an equity cushion, Debtor's continuing operations, or otherwise;

- More specifically, since Debtors' ability to reorganize is highly speculative at best, and Textron's collateral base is deteriorating and will continue to do so,

    - any purported equity cushion which may exist simply cannot constitute adequate protection, and

    - Debtor's purported equity cushion must be measured not by the "going concern" value of the collateral, but rather by its liquidation value, resulting in an "equity cushion" which is clearly insufficient given the continuing deterioration of Textron's collateral.

Accordingly, the Motion should be denied.

2.  **STATEMENT OF FACTS**

The facts concerning the financing relationship between Textron and Debtor, the lack of adequate protection, the deterioration of Debtor's business and collateral, and related matters, summarized below, are set forth in detail in the accompanying Declarations of Jeffrey Morse ("Morse Decl."), Brian Allen ("Allen Decl."), Leo D. Plotkin ("Plotkin Decl."), Michael J. Jones ("Jones Decl."), and Donald R. Palmer ("Palmer Decl.").

A.  **Textron's Financing Relationship with Debtor.**

Textron provides various types of financing, including asset-based loans, to its borrowers and clients. (Morse Decl., ¶ 4.) On or about May 22, 2002, Textron and Debtor entered into a Loan and Security Agreement (the "Loan Agreement"), as amended from time to time thereafter, pursuant to which Textron provided Debtor with a discretionary revolving credit facility (the "Credit Facility") in an amount not to exceed the Borrowing Base, which currently is defined as $5,300,000 or 85% of the aggregate amount of Debtor's Eligible Accounts (as defined in the Loan Agreement). (Id., ¶ 5 & Ex. "1".) The Loan Agreement is secured by all of the personal property of Debtor, including accounts receivable, inventory, machinery and equipment (the "Collateral"). (Id.)

On October 20, 2006, pursuant to an amendment to the Loan Agreement, Debtor executed a term note (the "Note") in favor of Textron, pursuant to which Textron provided to Debtor a term loan in the principal amount of $1,300,000. (Id., ¶ 6 & Ex. "2".) The Note is secured by the Collateral. (Id.) Textron properly perfected its security interest in the Collateral by various UCC-1 filings and amendments. (Id., ¶ 8 & Exs. "3"-"7".)

As of June 24, 2009 (the "Petition Date"), Debtor owed Textron $5,368,897.61 (exclusive of interest, attorneys' fees and costs from and after June 1, 2009) consisting of $4,740,564.38 due under the Credit Facility and $628,333.23 due under the Note. (Id., ¶ 9.)

B.  **Debtor's Pre-Petition Performance.**

Debtor's slide into bankruptcy was precipitated by a long stream of losses. Debtor has had only one, possibly two, profitable years since 2000. (Plotkin Decl., ¶ 11.) A review of a draft of Debtor's financial statement for the years ended December 31, 2008 and 2007 ("Financial Statement"), which was provided to Textron by Debtor and is included in Exhibit B to Debtor's Submissions Pursuant to

Order Setting Scheduling and Case Management Conference filed herein on July 23, 2009 ("Debtor's CMC Submissions"), reveals the following:

(a) For 2007, Debtor had a net loss of $2,717,867 on revenues of $42,653,780;

(b) For 2008, Debtor had a net loss of $1,471,471 on decreased revenues of $37,240,758;

(c) In 2008, Debtor showed a special loss on abandonment of inventory of $502,767;

(d) Debtor had a retained earnings deficit of $9,717,229 at year-end 2008, indicating that Debtor lost over $5.5 million in the years leading up to 2007 and 2008;

(e) In 2007, Debtor made prior-year adjustments including a reduction of inventory by approximately $4,546,000 as a result of abandonment or destruction (which is reflected in Debtor's over $5.5 million loss in the years leading up to 2007 and 2008); and

(f) At year-end 2008, Debtor had $7,622,369 in accounts receivable, net of a reserve of $159,686 for doubtful accounts. (Morse Decl., ¶ 10 & Ex. "8".)

Moreover, while Debtor's Income Statements as of May 31, 2009 and June 30, 2009, provided by Debtor to Textron, purport to reflect a year-to-date profit, (a) they reflect a continued trend of decreasing revenues (down over $1.33 million from 2008 to 2009 as shown on the 5/31 Income Statement, and down over $800,000—resulting from a questionable revenue increase in June that cut the year over year revenue loss by over $500,000—as shown on the 6/30 Income Statement), and (b) suspected inaccuracies in the Income Statements, if corrected, may well result in a loss for the year. (Id., ¶ 11 & Ex. "9".) More specifically, Textron suspects that the Income Statement is inaccurate based on, among other things, (a) in a tightening economy with price pressure on Debtor, Debtor's comparison of 2008 to 2009 reflects a decrease in cost of sale percentage (and a corresponding increase in gross profit percentage) of over 8% on the 5/31 Income Statement, and of over 6% on the 6/30 Income Statement, (b) Debtor's post-petition reporting showing a reduction of accounts receivable of $1,333,691.27 due to

the issuance of credit memos that would also be a reduction to revenues and for which no corresponding expenses were recorded on the Debtor's general ledger, (c) Debtor has provided accounts receivable information as of June 24, 2009 that acknowledges the reserve for doubtful accounts should be at least $917,474.83 as compared to a 2008 year-end reserve of only $159,686, suggesting that Debtor's revenue number in the Income Statement is overstated and profits accordingly are overstated (or alternatively that prior year revenue numbers were overstated and prior year losses accordingly understated) and (d) Debtor routinely pre-bills and/or overbills on its projects, resulting in artificial inflation of its revenues. (Id., ¶ 11.)

### C. Debtor's Post-Petition Performance.

Debtor's financial condition has continued to deteriorate during bankruptcy. A comparison of Debtor's 96-day Budget attached to the Cash Collateral Order in this proceeding, to Debtor's first post-petition report comparing actual performance to its budget for the period from the Petition Date through July 4, 2009, discloses the following:

(a) Budgeted expenses were $791,755, while actual expenses were $882,729, or 11.49% greater than budgeted expenses;

(b) While Debtor's first post-petition report does not appear to show sales, collections, credits, and adjustments for the entire period from the Petition Date through July 4, 2009, for the week ending July 4, 2009 Debtor indicates sales, less credits, of $277,001, or $40,467 less than collections (so that receivables decreased by that sum during the course of the one week); and,

(c) Debtor's first post-petition report reflects a $999,365 unexplained reduction in accounts receivable that apparently is related to a write-off of inter-company balances. (Id., ¶¶ 12-13 & Exs. "10"-"11".)

An examination of Debtor's July 25, 2009 Post-Petition Report reveals further deterioration:

(a)  While cash receipts were budgeted at $618,612 for that week in Debtor's 96-day Budget (Ex. "10" to Morse Decl.), actual cash receipts totaled only $408,034, for a shortfall of $210,578 during that week alone; and

(b)  Adjustments (reductions) were made to accounts receivable for "joint checks" in the amount of $114,265, which, as discussed further below, is only a small part of the total $1,635,158 valuation reserve set by Debtor for these potential lien claims in its Accounts Receivable Valuation as of June 24, 2009 ("Debtor's A/R Valuation") provided by Debtor to Textron, a true copy of the first page of which is included in Exhibit "13" attached hereto. (Id., ¶ 14 & Exs. "10", "12", & "13".)

Moreover, although Debtor reports revenues of $2,742,071 for the month ended July 23, 2009, actual revenues reported to Textron on the four post-petition reports for that period were only $2,065,546. (Morse Decl., ¶ 15; Plotkin Decl., ¶ 10.)

Debtor also provided a 120-day Budget which, together with the other facts set forth below, further demonstrates the uncertainty of Debtor's future and the deterioration of the Collateral:

(a)  Cash requirements for the 120-day period total $10,229,959, and while cash receipts total $10,193,271, total billings for this period are only $8,880,177, meaning that expenditures would exceed sales by over $1.3 million, resulting in a significant loss for this period on a financial statement basis;

(b)  Cash requirements for the 120-day period do not include any amounts for professional fees or U.S. Trustee fees, and according to Debtor's Budgets of Professionals attached as Exhibit D to Debtor's CMC Submissions herein (Morse Decl., Ex. "16"), Debtor's professional fees alone for July through October 2009 are anticipated to total an

additional $200,832, resulting in an even more significant loss;

(c)    Accounts receivable for this period decline by $1,313,094 (the same amount by which the total cash receipts exceed the total billings for this period noted in subparagraph (a) above), from a beginning balance of $9,437,298 for the week of July 27, 2009 to an ending balance of $8,124,204 for the week of November 16, 2009, so that Debtor is de facto anticipating financing its over $1.3 million cash shortfall during this period by collecting accounts receivable and correspondingly reducing Textron's collateral position; and

(d)    Debtor budgets a total of only $520,000 for "joint checks", which, as discussed further below, still is only a small part of the total $1,635,158 valuation reserve set by Debtor for these potential lien claims in Debtor's A/R Valuation as of June 24, 2009 (Id. at ¶16 and Exs. "13", "15", & "16").

Finally, in a report Textron prepared comparing Debtor's actual post-petition performance based on its weekly reports provided to Textron, to its budgeted performance for those periods (the "Cumulative Performance Report"), further deterioration in Debtor's financial condition and the Collateral is revealed:

(a)    Debtor's accounts receivable balance as of the Petition Date totaled $11,022,142, and had decreased over $2.4 million to $8,559,088 as of August 1, 2009 – already over $600,000 under Debtor's budgeted receivables of $9,282,034;

(b)    Debtor already has fallen short of budgeted sales by $1,601,123 ($2,565,451 in reported, versus $4,166,574 in budgeted, sales);

(c)    Debtor's available cash over this period was $723,136 under budget ($2,642,642 in reported, versus $3,365,778 in budgeted, cash available), and its ending cash balance was

only $40,780;

(d) Debtor is $112,011 behind budget on paying its payroll taxes, and has been delaying paying payroll and payroll taxes until the week following the budgeted week (payroll and payroll taxes paid during the weeks ending July 18 and August 1 were budgeted to be paid during the prior weeks; see Exhibits "10" [96-day Budget] and "15" [120-day Budget] to Morse Decl.);

(e) Debtor is far behind on paying budgeted expenses, including a $20,000 appraisal fee budgeted for the week ending July 20 and sales taxes totaling $58,975 budgeted for the week ending July 27 (see Exhibit "10" [96-day Budget] Morse Decl.), none of which it has paid;

(f) Debtor still has not paid any professional fees, other than $9,371 shown during the week ending July 25. (Morse Decl., ¶ 18 & Exs. "10", "15", and "18".)

**D. The Value of the Collateral.**

    **1. Intentional Overstatement of Receivables**

The Collateral consists of Debtor's accounts receivable, inventory, and equipment. Debtor's accounts receivable represent a constantly moving target, and its figures cannot be trusted. In recent Rule 2004 examinations, Debtor's employees admitted that they engaged in an intentional scheme to overstate Debtor's receivables in order to increase availability under the Credit Facility. Pursuant to the scheme, Debtor prepared invoices based not on work actually performed, but rather on work Debtor estimated it would complete during the course of the month (the "Forecast Invoices"). Debtor incorporated the Forecast Invoices into its calculation of the borrowing base available under the Credit Facility, and provided the resulting borrowing base certificates and the Forecast Invoices to Textron as if they represented actual accounts receivable. (Plotkin Decl., ¶¶ 5, 13.)

At the end of each month, Debtor prepared and transmitted to its customers manual invoices reflecting the work actually performed (the "Actual Invoices"), but did not provide the Actual Invoices to Textron. Debtor then issued credits for the difference between the Forecast Invoices and the Actual Invoices, which were generally substantial since the actual work was lower than the forecasts, and posted the credits on its accounts receivable ledger. When Textron voiced concerns about the excessive level of credits, Debtor ceased posting the credits to its accounts receivable ledger, but continued to issue Forecast Invoices for work not performed while issuing Manual Invoices for work actually performed and sending the latter only to their customers. These credits accumulated to such an extent that, at the time Debtor filed bankruptcy, it posted a credit of approximately $1.2 million. Textron has no confidence that the credit accurately accounts for the massive overstatement in receivables in which Debtor engaged. (Plotkin Decl., ¶¶ 6, 13-14 & Ex. "3"; Morse Decl., ¶ 21 & Ex. 19.)

### 2. Valuation of Accounts Receivable

Even accepting Debtor's statement of its gross accounts receivable, significant adjustments must be made to arrive at a proper liquidation value. Set forth in the Allen Declaration is an analysis of what the receivables could be expected to yield in a liquidation scenario. Allen assigns a higher collectability percentage to receivables on projects that are 90% complete or better (Type 1 Receivables) than he does to projects that are less than 90% complete (Type 2 Receivables). In the latter case, in a liquidation scenario, Debtor's customers would probably have to complete the projects by obtaining another contractor at an increased cost. Debtor's customers are not likely to pay any sums owing Debtor until such costs have been determined and credited against amounts they would otherwise owe Debtor. Receivables accordingly could be reduced substantially or be offset entirely, warranting a lower collectability percentage. (Allen Decl., ¶¶ 2-3 & Ex. "2".)

A substantial adjustment must also be made to take into account potential lien claims. Many of Debtor's suppliers have threatened to assert their mechanic's lien rights against Debtor's projects. Debtor's customers have accordingly begun to insist that they make payment to Debtor by means of a check jointly payable to Debtor and its unpaid suppliers to ensure the lien claims are satisfied. To the extent that the suppliers' mechanic's liens have priority over Textron's security interest, a reserve must be made against the receivables to account for the lien claims. In its June 29, 2009 Borrowing Base Certificate (Ex. "19" to Morse Decl.), Debtor estimated the reserve at approximately $1.635 million. However, the 7/25 Post-Petition Report (Ex. "12" to Morse Decl.) shows adjustments (reductions) to accounts receivable for "joint checks" in the amount of $114,265, and Debtor's 120-day Budget (Ex. "15" to Morse Decl.) budgets a total of only $520,000 for "joint checks", leaving over $1 million of these potential lien claims entirely unaccounted for by Debtor's post-petition reporting and 120-day Budget. (Morse Decl., ¶20 and Exs. "12", "13", "15"; Allen Decl., Ex. "2".)

Based upon the foregoing considerations, Allen estimates the liquidation value of Debtor's receivables range from $1,675,299 to $2,452,123. (Allen Decl., ¶ 3.)

### 3. Valuation of Machinery and Equipment/Inventory

Textron has also obtained an appraisal of Debtor's machinery and equipment based upon an equipment listing dated July 10, 2009 that Debtor provided to Textron. Debtor's listing indicated a liquidation value of $1.4 million, far below the $3 million shown in its cash collateral motion. Further, the listing is largely based upon unsubstantiated "estimates" and values apparently obtained from various web sites, and does not appear to include the substantial costs of sale. Textron's expert appraiser

estimates the liquidation value of the machinery and equipment, accounting for necessary costs of sale, at approximately $852,000.[1] (Jones Decl., ¶ 2 Ex. "A".)

Finally, Textron is in the process of obtaining an appraisal of Debtor's inventory.[2] Debtor has estimated the liquidation value of its inventory at approximately $1.62 million. Debtor's evaluation is suspect, as it has inventory write downs of over $5 million in the past few years. (Morse Decl., ¶ 25.) Moreover, the stated liquidation value does not take into consideration costs of liquidation such as keeping the store open, paying the rent and maintaining the inventory. (Plotkin Decl., ¶ 17.)

### 4. Summary of Collateral Valuation

Even accepting Debtor's likely over-stated inventory liquidation value, Textron estimates the total collateral value for the personal property assets at between $4,150,299 to $4,927,123 in accounts receivables, $852,000 in machinery and equipment, and an inflated $1,623,000 in inventory). (Morse Decl., ¶ 26.)

## 3. THE CASH COLLATERAL MOTION MUST BE DENIED BECAUSE TEXTRON IS NOT ADEQUATELY PROTECTED.

### A. Debtor Bears the Burden of Proof of Adequate Protection.

Debtor is not entitled to use of Textron's cash collateral because it cannot establish that Textron is adequately protected. See 11 U.S.C. § 363(e). As the debtor-in-possession, Debtor bears the burden of proof on the issue of adequate protection. See id., § 363(p)(1).

---

[1] Debtor recently provided Textron with updated vehicle and equipment listings increasing the purported liquidation value to approximately $1.53 million. Textron will address the discrepancies between the two listings prior to or at the hearing on the Motion.

[2] Textron anticipates that the appraisal will be completed prior to the hearing on the Motion and will provide it for the Court's consideration prior to or at the hearing, depending upon when it becomes available.

B.  **No Sufficient Equity Cushion Exists.**

Debtor asserts that Textron is adequately protected by an "equity cushion" in the Collateral. Debtor cannot, however, prove that an adequate equity cushion exists. Case law has almost uniformly held that an equity cushion under 11% is insufficient to constitute adequate protection. Kost v. First Interstate Bank of Greybull, 102 B.R. 829, 831-32 (D. Wyo. 1989); see also, In re Atrium Development Co., 159 B.R. 464, 471 (Bankr. E.D. Va. 1993); In re Mediterranean Associates, L.P., 1993 WL 541671, at *2 (E.D. Pa. 1993).

As a preliminary matter, the appropriate valuation methodology under the circumstances is a liquidation scenario. Because Debtor's chances of rehabilitation are, at best, highly speculative, the "appropriate yard stick" for measuring the value of Debtors' assets is liquidation value. In re Sharon Steel Corp., 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993); see also, In re Schwinn Bicycle Co., 192 B.R. 477, 486-87 (Bankr. N.D. Ill. 1996) (holding that "the liquidation value method is the proper valuation standard for the purpose of this case because the Debtor was not financially viable, was in severe financial distress and was on its 'deathbed'", and "[t]o treat such a company as a going concern would be misleading and would, in fact, fictionalize the company's true financial condition."); In re Middleton Place Associates, 1993 U.S. Bankr. LEXIS 2171, at *41 (Bankr. E.D. Pa. 1993) ("If the debtor can prove both that the collateral is necessary for an effective reorganization and that an effective reorganization is likely . . . it follows that the going concern value of the collateral should also be used. . . . If reorganization is unlikely or the collateral is unnecessary, the collateral will eventually be liquidated or sold . . . making liquidation value appropriate."); In re Helionetics, Inc., 70 B.R. 433, 440 (Bankr. C.D. Cal. 1987) (advocating the use of going-concern value only for an ongoing Chapter 11 debtor, with reasonable prospects that it can continue and where "there is every reason to believe that debtor will succeed in this Chapter 11 reorganization").

The use of liquidation value rather than going-concern value is particularly appropriate here because, as set forth in detail in Parts 2.B and 2.C above, (a) Debtor has been losing money for years, (b) Debtor's revenues have been declining and in this economic environment can only be expected to continue to decline, (c) Debtor apparently with some frequency is required to significantly write-down both its inventory and its accounts receivable, and (d) Debtor has presented no plan to turn its operations around.

In its Motion, Debtor values its cash, receivables, inventory, and equipment (less liens senior to that of Textron) at over $14 million, a grossly exaggerated figure. Subsequent information provided by Debtor demonstrates that its valuation is a constantly moving target. As set forth in Part 2.D above, Debtor now estimates the liquidation value of the inventory at approximately $1.6 million (less than half of the $3.5 million value stated in the Motion), and equipment at approximately $1.4 million (again, less than half of the $3 million value stated in the Motion). Moreover, those values do not appear to be based upon an independent appraisal, or take into account the substantial liquidation costs that will be incurred. Textron's machinery and equipment appraisal, however, takes such costs into account in determining a liquidation value of approximately $852,000. Further, although Textron's inventory appraisal has not been completed, even accepting Debtor's inventory liquidation value of roughly $1.6 million, an insufficient equity cushion exists.

Further, the receivables are overstated in an unknown amount, and do not take into account the substantially reduced percentage that may be expected to be collected in liquidation. Allen's analysis demonstrates a more realistic value of $1,675,299 to $2,452,123 in receivables collected in liquidation. (Allen Decl., ¶ 3 & Ex. "2".)

Accordingly, against Textron's debt of approximately $5.4 million, the liquidation value of all personal property assets is estimated to range from $4,150,299 to $4,927,123. Plainly, Textron is not protected by an adequate equity cushion in the Collateral.

Debtor also pads its equity calculation by including a grossly-inflated $20 million value of real property (the "Real Property") owned by an affiliate, Teufel Holly Farms, that secures a guaranty in Textron's favor. Guaranties from related parties neither provide adequate protection nor should be considered in determining the existence of an equity cushion. See In re Kenny Kar Leasing, Inc., 5 B.R. 304, 309 (Bankr. C.D. Cal. 1980) ("To compel a secured creditor to accept such risks on the basis of rights to pursue a guarantor, is to shift the hazards and the cost of the rehabilitation effort from the debtor to the secured creditor. Such a proposition is not within the contours of the concept of adequate protection embodied in the Code").

In any event, Textron has obtained an appraisal from Donald R. Palmer that values the Real Property, assuming a six-month marketing period, at $6,760,000 (and assuming a three-month marketing period, at $5,800,000). (Palmer Decl., ¶ 3 & Ex. "A".) Moreover, as Debtor concedes in the Motion, the debt on the Real Property ahead of Textron totals approximately $3,300,000. However, further adjustments must be made.

Sale of the Real Property will generate approximately $500,000 in closing costs, and Textron will incur approximately $400,000 in additional costs of taking out the first-position lender on the Real Property, since Teufel Holly Farms can be expected to stop making payments on the senior debt during the foreclosure process. Therefore, if the Real Property is sold with a six-month marketing period, Textron would recover approximately $2,560,000 ($6,760,000 less $4,200,000 in closing costs and total costs of paying off the first-position lender), and if it sold with a three-month marketing period, would

recover only $1,600,000 (using the three-month marketing period value of $5,800,000). (Morse Decl., ¶ 27.)

The conclusion is inescapable: Debtor has insufficient equity in the Collateral to provide Textron with adequate protection of its interests. The Motion should be denied.

C.  **The Collateral Is Declining and Will Continue to Decline in Value, and Debtor Has No Reasonable Chance of Reorganization.**

Furthermore, even if an apparently sufficient equity cushion exists, which it definitely does not here, the issue of adequate protection to a creditor is determined on a case-by-case basis rather than by mechanical application of a formula. Kost, 102 B.R. at 831. Thus, an analysis of whether continued cash collateral usage should be allowed typically goes beyond the issue of whether an "equity cushion" exists, and adequate protection will not be found if (a) the debtor has no reasonable chance of reorganization, (b) the collateral threatens substantially to decline in value, or (c) debtor's business plans may result in rapid deterioration of the collateral.

In In re American Sweeteners, Inc., 2000 WL 1010582, at *4 (Bankr. E.D. Pa. 2000), the court explained as follows:

> "Before examining the adequate protection offered to the creditor, the Court should consider whether there is any reasonable chance of reorganization, for if there be none, there is no point in jeopardizing the creditor's cash collateral. In re C.F. Simonin's Sons, Inc., 28 B.R. 707, 711 (Bankr. E.D. N.C. 1983). [Footnote omitted.] While almost all Chapter 11 cases involve an element of risk, a high degree of uncertainty is a factor to be considered in evaluating the secured creditor's adequate protection. Thus, I reject Debtor's notion that it is entitled to use cash collateral without regard to the Debtor's business operations so long as an equity cushion provides adequate protection of MCP's collateral."

In LNC Investments, Inc. v. First Fidelity Bank, N.A., 1997 WL 528283, at *6 (S.D.N.Y. 1997), the court noted,

> "'[R]ecent decisions in this Circuit have rejected the equity cushion approach in favor of a more individualized analysis of the specific risks threatening the

> collateral.' Id. at *4. In In re Elmira Litho, Inc., 174 B.R. 892 (Bankr. S.D.N.Y. 1994), the Court noted that 'an equity cushion can, under certain circumstances, serve as a form of adequate protection,' id. at 904, but that to establish a lack of adequate protection, a secured creditor need show only that the value of the collateral is declining as a result of the automatic stay. Id. at 902; see also LNC III, 1995 WL 231322, at *4 (citing cases in which courts have emphasized actual or likely diminution in value of the collateral during pendency of bankruptcy to establish lack of adequate protection). Thus, despite the existence of an equity cushion, a Bankruptcy Court could find a lack of adequate protection based on a threatened decline in the value of the collateral.
>
> Here, . . . I held previously that the Bankruptcy Court might have found a lack of adequate protection despite the existence of a 50% equity cushion. Id. at *5. Indeed, I noted that 'while it may be unfair to view events in hindsight, the rapid erosion of the equity cushion suggests it was possible to anticipate the danger ultimately realized.' Id."

While the American Sweeteners court holds that examination of debtor's business operations is always required (even where an equity cushion exists), and the LNC court advocates an individualized analysis of the specific risks threatening the collateral over an equity cushion analysis (holding that even a 50% equity cushion may not be sufficient in the face of serious risks to the collateral), other courts have focused upon whether, when an equity cushion does exist, it will be dissipated by continuing business operations:

> "We believe it improper to look at valuation of assets in a vacuum. While the present value of a debtor's assets may be sufficient to constitute adequate protection, a debtor's future operational plans may result in a rapid deterioration of the collateral. Where an equity cushion is insufficient in size or likely to erode, it cannot, standing alone, constitute adequate protection. See In re Liona Corp., 68 B.R. 761, 767 (Bankr.E.D.Pa. 1987).
>
> We view the issues in the present matter as: 1) Whether the value of the Debtor's assets exceed the amount of its secured obligations, thus providing an equity cushion for the Lenders, and 2) If an equity cushion exists, whether that equity cushion provides the Lenders with sufficient adequate protection . . . ." In re Sharon Steel Corp., 159 B.R. 165, 169 (Bankr. W.D.Pa. 1993).

See also, In re WRB West Associates Joint Venture, 106 B.R. 215, 220 (Bankr. D. Mont. 1989) (holding that "the equity cushion itself, as is present in this case [40%], must be protected against erosion by accruing interest, depreciation or other changes"); In re Liona Corp., N.V., 68 B.R. 761, 767

(Bankr. E.D. Pa. 1987) (holding that "the existence of an equity cushion, by itself, does not always adequately protect the interest of a secured factor. Various factors must also be considered", including, among others, the size of the equity cushion and the rate at which it will be eroded); In re Colrud, 45 B.R. 169, 173, 179-80 (Bankr. D. Alaska 1984) (finding that even an equity cushion of well over 100% did not constitute adequate protection in view of serious risks).

The proper focus of any adequate protection inquiry must be whether or not the debtor's use of cash collateral will reduce the value of the secured creditor's collateral base post-petition, i.e., whether that collateral base has, or is likely to, deteriorate post-petition. United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 108 S.Ct. 626 (1988); see also, In re Helionetics, Inc., supra at 441 (in holding that a 20.4% equity cushion constituted adequate protection, emphasizing that "[t]here is no evidence debtor's assets are deteriorating or depreciating so the value of [the secured creditor's] interest is stable. However, should circumstances change, [the secured creditor] is not precluded from bringing another motion for relief....").

Here, (a) Debtors' ability to reorganize is highly speculative at best (American Sweeteners test), (b) any equity cushion which may exist cannot constitute adequate protection (Sharon Steel test), and (c) Textron's collateral base will quickly deteriorate (Timbers test), and cash collateral use accordingly should not be authorized.

Part 2.B above demonstrates that Debtor's pre-petition financial condition was grave. Since entering bankruptcy, and as set forth in Part 2.C above, Debtor has continued to lose money and has failed to meet its sales and cash targets, and has failed to adequately budget for certain expenses and pay for other budgeted expenses.

Further, Debtor's president has admitted that Debtor cannot survive without $2 million cash over and above its debt to Textron. Debtor has attempted to obtain both take-out and DIP financing, but the

vast majority of the 24 to 30 lenders Debtor has approached has refused to provide financing and no commitments have been made by anyone. Further, Debtor admitted that its 120-day budget does not work if it does not obtain DIP financing, but could give no realistic estimate of when it might obtain DIP financing. (Plotkin Decl., ¶¶ 8, 16.)

Moreover, Debtor has admitted that (a) liquidity has been a problem and will continue to be a problem in the bankruptcy, (b) at some point it will run out of variable costs to cut, and most of the remaining places that could be cut are in administration and project management. In addition, if the home building and construction business does not pick up or Debtor does not increase its market share, its revenues will continue to go down. Debtor already has lost a $600,000 job as a result of the bankruptcy filing. Debtor also has had to lower its margins from in the range of 30% or more to 16% to 18% on some recent construction projects. (Plotkin Decl., ¶ 9.) Debtor's prospects of survival are bleak.

While Debtor struggles to stay alive by spending cash collateral, the value of Textron's collateral continues to shrink. Debtor's intentional overstatement of its receivables to increase its pre-petition borrowings from Textron renders its gross receivables numbers extremely suspect. Further, its failure to generate new receivables at the projected rate further imperils Textron's collateral position. With no financing apparently available to Debtor, and in the face of continuing losses, its prospects of reorganization is slight. Dramatically shrinking profit margins are hastening Debtor's deterioration. Under these circumstances, any equity cushion that the Court finds to exist is plainly insufficient to protect Textron from Debtor's rapid slide. The claimed equity cushion is simply insufficient to provide adequate protection of Debtor's interest in the Collateral. The Motion should be denied.

///

///

///

## 4.  CONCLUSION

For all the reasons set forth above, Textron respectfully requests that the Cash Collateral Motion be denied in its entirety.

DATED: August 10, 2009

LARKINS VACURA, LLP
CHRISTOPHER J. KAYSER

LEVY, SMALL & LALLAS
A Partnership Including Professional Corporations
LEO D. PLOTKIN

By: *[signature]*
Leo D. Plotkin
(Admitted in *Pro Hac Vice*)
Attorneys for Secured Creditor
Textron Financial Corporation

23849-2