Robert J Vanden Bos OSB #78100
VANDEN BOS & CHAPMAN, LLP
319 S.W. Washington, Suite 520
Portland, Oregon  97204
TELEPHONE:  (503) 241-4869
FAX: (503) 241-3731

     Of Attorneys for Debtor-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | ) Case No. 09-34880-elp11 |
| | ) |
| Teufel Nursery, Inc., | ) |
| | ) DEBTOR'S REPLY TO TEXTRON FINANCIAL |
| | ) CORPORATION'S OPPOSITION TO |
| | ) DEBTOR'S MOTION FOR INTERIM ORDER |
| Debtor-in-Possession. | ) AUTHORIZING USE OF CASH COLLATERAL |

     Teufel Nursery, Inc. ("Debtor" or "Teufel"), submits this reply to Textron Financial

Corporation's ("Textron") opposition to Debtor's Motion For Interim Order Authorizing Use

Of Cash Collateral.

## I.  INTRODUCTION

     The issue currently before the Court is Debtor's motion for an interim order

authorizing use of cash collateral for the 96 day period ending September 28, 2009.  The

Court has previously entered orders based on the consent of the parties allowing Debtor to

use cash collateral through August 30, 2009.  The only issue for determination on a motion

to use cash collateral is whether the secured party will be adequately protected during the

period in which cash collateral will be used.  11 U.S.C. § 363; In re Eichler, Case No. 301-

40539-tmb11 (Bankr. D. Or. July 26, 2002) (only issue on use of cash collateral is whether

Page 1 of 15 -   DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S
MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

lender is adequately protected) (copy attached as **EXHIBIT A**); In re Coventry Commons Associates, 149 B.R. 109, 114 (Bankr. E.D. Mich. 1992) ("under § 363, a debtor is entitled to use property in which a creditor has a security interest if that interest is adequately protected. This unremarkable principle applies both preconfirmation and post-confirmation.") (citations omitted).

## II. FACTS

The only facts relevant to this motion are those that bear on the issue of whether Textron is adequately protected with respect to Debtor's proposed use of cash collateral for the 28 days ending September 28, 2009.  Textron would have the Court believe that there are a multitude of issues to be decided on this motion, but there are not.  There is only one motion pending, which is a motion to use cash collateral for the remaining 28 days of the original 96 day period.  However, Textron's recitation of the history of the lending relationship between the Debtor and Textron is both grossly distorted and materially misleading, and therefore, despite being irrelevant to the issue at hand, requires a cursory rebuttal, with Debtor reserving its rights to make a full response at a later time in an appropriate forum.

A.    Textron's Allegations of Malfeasance

Textron alleges in its opposition that Debtor "engaged in an intentional scheme to overstate Debtor's receivables" by using inflated forecasted invoices in order to calculate its borrowing base, and then posted credits to its accounts receivable ledger in the amount of the difference between the forecasted invoices and the actual invoices.   (See Textron's Opposition to Debtor's Motion ("Textron Opp.") at p. 7).  Textron's feigned outrage at Debtor's billing and accounting practices is belied by the facts.   Textron's own documents show that Textron was well aware of Debtor's billing practices (See Declaration of Robert J

Page 2 of 15 -    DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S
MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

Vanden Bos ("Vanden Bos Declaration") ) and not only acquiesced to Debtor's billing practices, but continually raised the percentage of the Debtor's borrowing base that Debtor could draw upon.

Throughout the life of the loan, Textron conducted quarterly audits during which Textron had complete and unfettered access to Debtor's job files that included copies of the actual invoices for work performed.   (See Declaration of Lawrence A. Teufel ("Teufel Declaration"), p. 11)  In addition to the auditing record, which demonstrates that Textron had knowledge of Debtor's billing practices from the inception of the loan, emails from Textron show that the topic was explicitly discussed between Debtor and one of Textron's auditors in 2006, (See Vanden Bos Declaration) contrary to Textron's suggestion that this truth was somehow unearthed at Debtor's 2004 examinations.    If Textron had an issue with Debtor's practices, Textron had any number of remedies within its sole discretion to exercise, such as lowering the percentage of the borrowing base the Debtor could draw against, yet Textron took no such action. (Teufel Declaration, p. 11)  In fact, Textron raised the percentage of the borrowing base during the life of the loan.  (Teufel Declaration, p. 11) Jeffrey Morse, Textron's senior vice president, testified at deposition that the not uncommon response taken in the ordinary course of Textron's business to deal with debtors who have an excessive "dilution rate" (translated, have a frequent history of excessive credits) is to simply reduce the allowed borrowing base percentage.  (Morse Deposition, p.101-102).  Textron did not do that for years for Debtor's account despite knowledge of the forecasted billings, credits and dilution issues.

The documents attached to the Vanden Bos Declaration are just a sample of the relevant documentation that demonstrates that Textron at all times was aware of, and acquiesced in, Debtor's billing practices.

Page 3 of 15 -    DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S
MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

B.    Valuation of Textron's Collateral

As of the petition date, Debtor owed Textron approximately $5.3 million under the Credit Facility and Note combined.  Textron's debt is secured by essentially all of Debtor's property, and by land owned by Teufel Holly Farms, Inc., ("Holly Farms Property") a related entity of Debtor.

Textron's briefing provides some estimates for the value of certain of the Debtor's assets.  In addition to omitting some assets entirely, flaws in Textron's sworn statements as to the value of its collateral grossly understate the true value of the collateral by as much as the full amount of Textron's debts.  Debtor's valuation of Textron's collateral is as follows:

1.  Holly Farms Property: Debtor, for the purposes of this motion, accepts $9,580,000 as the value of the Holly Farms Property, a value that is the midpoint between the appraised value reached by Debtor's appraiser, Okenski, and the fair market value reached by Textron's appraiser, Palmer.  (Teufel Declaration at p. 2).  Debtor rejects Textron's purported "disposition values" as both unsupported by competent analysis and as unrealistically conditioned on an arbitrarily shortened marketing time period.  For the purposes of this motion, Debtor is further willing to accept Jeffery Morse's costs of liquidation ($900,000).  After deducting the costs of liquidation ($900,000) and the first lien of Umpqua Bank ($3,300,000), the net recoverable value of the real estate is $5,380,000.

2.  Equipment: For the purposes of this hearing only, Debtor will accept the value of the Pahl appraisal for equipment and vehicles, which is $852,875.

3.  Inventory: Based on the Willis appraisal, the liquidation value of the inventory is $2,244,999.  (Teufel Declaration at p. 3).

4.  Maintenance Division: The value of the Maintenance Division is not less than

VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

$4.6 million.  (Cogence Group Report).

5.  <u>Accounts Receivable</u>: Debtor disputes Textron's valuation of Debtor's accounts receivable, and a careful review of Textron's methods reveals that it is severely understated as a result of a lack of understanding of the nature of Debtor's receivables accounts, Debtor's lien rights, the cost of finding replacement contractors should Debtor fail to complete the jobs, and a math error that resulted in the double deduction for the liens rights Debtor's vendors have.  (Teufel Declaration at p. 3-7).  Correcting for all of those errors, the actual value of Debtor's accounts receivable is $3,941,189.  (Teufel Declaration at p. 7).

The following is a summary of the collateral that Textron is protected by during the period that Debtor is requesting authority to use cash collateral:

| DESCRIPTION | AMOUNT |
|---|---|
| Real Estate | $5,536,160.00 |
| Equipment | $852,875.00 |
| Inventory | $2,244,999.00 |
| Accounts Receivable | $3,941,189.00 |
| Maintenance Division | $4,600,000.00 |
| TOTAL: | $17,175,223.00 |

Because Textron's secured claims amount is approximately $5.3 million, it has an equity cushion of approximately $11,875,000, or 224%.

### III.  ARGUMENT

A.    <u>The Proper Valuation Method is a Going Concern Valuation</u>

"In the initial stages of a Chapter 11 proceeding, the debtor should be granted significant leeway in attempting to establish that successful reorganization is a reasonable possibility."  <u>In re Ashgrove Apartments of DeKalb County, Ltd.</u>, 121 B.R. 752, 758 (Bankr.

Page 5 of 15 -    DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

S.D. Oh. 1990).  The presumption in favor of the debtor's reorganization exists so that the business can "continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners."  United States v. Whiting Pools, 462 U.S. 198, 203 (1984); see also U.S. Ass'n of Texas v. Timbers of Inwood Forest Associates, 485 U.S. 365 (1988) (noting that in the first four months of a bankruptcy, during which the debtor has the exclusive right to file a plan, a lesser showing of ability to reorganize is required); In re 6200 Ridge, Inc., 69 B.R. 837, 843 (Bankr. E.D. Pa. 1987) (in the early stages of bankruptcy uncertainties should be resolved in the debtor's favor to allow the debtor time to clean house and propose a plan). The ultimate goal of Teufel's reorganization is to protect the jobs of its 300 employees and to preserve a business that has enjoyed an outstanding reputation in the community for over 100 years.

Textron contends that Debtor's chances of rehabilitation are highly speculative, and cites to In re Helionetics for the proposition that going concern value is only appropriate for a debtor where there is every reason to believe that the reorganization will succeed.  70 B.R. 433, 440 (Bankr. C.D. Cal 1987).  Textron's argument is both wrong as a matter of fact and a matter of law.  The correct standard, as laid down by the Supreme Court is that the Debtor must show "a reasonable possibility of a successful reorganization within a reasonable time."  U.S. Ass'n of Texas v. Timbers of Inwood Forest Associates, 485 U.S. 365, 374 (1988).  Therefore, in order to avail itself of going concern values at this point, Debtor need not show how it will reorganize, but only that there is a reasonable possibility that it will submit a confirmable plan within a reasonable time.

Debtor has met this burden by performing at or near budget, and testimony will show that Debtor has been operating at break even and at a slight profit.  Numerous courts have held that the valuation method should reflect a debtor's proposed use of the assets.

Page 6 of 15 -    DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

In re Winthrop, 50 F.3d 72, 74 (1st Cir. 1995)  (going concern valuation should be used on

assets the debtor proposes to retain); In re Pawtuxet Valley Prescription& Surgical Center,

Inc., 386 B.R. 1, 4 (D.R.I. 2008) (holding that going concern value is proper measure of

value at an early juncture in a Chapter 11 case and noting that the Code authorizes debtor

to operate for many months prior to submitting a plan).  Therefore, Debtor has met its

burden of showing that it is a going concern, and therefore a going concern value should

apply to its assets instead of a forced liquidation value.

Furthermore, testimony will show that even if Debtor is unable to successfully

reorganize, Debtor will be able to offer a plan of orderly liquidation in order to realize the full

value of its assets to satisfy its creditor's claims and retain value for its shareholders.  A

liquidation plan is a valid plan, and is a type of plan that is routinely confirmed by courts to

preserve value for both creditors and equity holders.  Textron's position that Debtor is in an

all or nothing situation, and must either prove that Debtor will reorganize or otherwise face

a forced liquidation is wrong as a matter of law.   Congress expressly rejected this

proposition when it adopted the Section 361 governing adequate protection. S. Rep. No.

989, 95th Cong., 2d Sess. 54 (1978) ( "Neither is it expected that the courts will construe

the term value to mean, in every case, forced sale liquidation value or full going concern

value. There is wide latitude between those two extremes although forced sale liquidation

value will be a minimum.  In any particular case, especially a reorganization case, the

determination of which entity should be entitled to the difference between the going

concern value and the liquidation value must be based on equitable considerations arising

from the facts of the case.").

Notably, Textron has litigated this issue in bankruptcy court before and lost.  The

Bankruptcy Court for the District of Montana recently held against Textron on this exact

Page 7 of 15 -    DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S
MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

issue, in an even more extreme situation.   In re Sport Land, Inc., 2009 Bankr. LEXIS 912

(Bankr. D. Mt. March 6, 2009).  In that case, the court found that using a forced liquidation

value, Textron would not be adequately protected, but that if debtor were allowed 12 to 18

months to conduct an orderly liquidation, Textron would be adequately protected.  The

court held that  "[w]ith respect to Textron's contention that it lacks adequate protection, the

evidence shows to the contrary that Textron is adequately protected only while the Debtor

conducts an orderly liquidation of Textron's purported collateral."  Id. at *19.   The court

denied Textron's motion and allowed the debtor to use Textron's cash collateral on the

grounds that debtor would propose a liquidation plan to capture the orderly liquidation

value of its assets.   A similar situation is presented here.  Debtor will present testimony

that its assets, particularly the maintenance business it runs, have significant value as a

going concern, and that one possible plan Debtor may submit will involve operating the

business as is necessary to maintain that value until a segment of its business or a portion

of Textron's collateral can be sold for a maximum value.

Even assuming, *arguendo*, that Debtor is unable to propose a confirmable plan at

all, the proper valuation method for Debtor's assets, most notably the maintenance division

and the Holly Farms property,[1] is still a going concern valuation.  If Debtor fails to confirm a

plan, the case will likely be converted to a chapter 7 liquidation, in which case the chapter 7

trustee would have an obligation to maximize the return to creditors.

---

[1] Although the Holly Farms property is owned by a separate entity, Teufel Holly Farms, Inc., and is not property of the estate, testimony from its majority shareholder will demonstrate that should Textron seek to foreclose on its trust deed Teufel Holly Farms, Inc. would file a Chapter 7 bankruptcy.  At deposition, Textron's senior vice president Jeffery Morse admitted that Textron assumed Teufel Holley Farms, Inc. would file for bankruptcy and that assumption played into Textron's assessment of the costs of liquidating that property.

Page 8 of 15 -    DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

With respect to the Holly Farms Property, testimony will show that given its value of close to $10 million, no reasonable trustee would insist on a fire sale that would net only half that much.  If Textron's disposition values are to be accepted, which Debtor does not, then a trustee would be in possession of a rapidly appreciating asset, and would have a duty to make reasonable efforts to realize the full value.  Marketing a piece of real estate for one year is well within the realm of reasonable actions for a chapter 7 trustee to take to maximize the value of the estate.  As a result, the fair market value is the minimum value the Holly Farms should be assigned in an adequate protection analysis, as opposed to the 3 month disposition value that Textron posits.

Turning to Debtor's maintenance division, the most accurate value to assign to it in a Chapter 7 liquidation is its going concern value of approximately $4.6 million to $5.5 million. Testimony will show that the maintenance division could be sold for approximately $4.6 million to $5.5 million, so long as the division remains in continuous operation.   "The Code authorizes that under appropriate circumstances, the trustee may even operate the Debtor's business for a limited period, see  § 721, thereby allowing for the sale of the business as a going concern.". In re Transcon Lines, 178 B.R. 228, 234 (Bankr. C.D. Cal. 1995); see also 11 U.S.C. § 721.  Testimony will show that given an asset with as much value as Debtor's maintenance division, a reasonable chapter 7 trustee would operate the business until it could be sold rather than let its value disappear.

The combined value of all of the collateral that protects Textron, is $17,175,223, providing an equity cushion of approximately 224%. (Teufel Declaration p. 11).  The Ninth Circuit has held that equity cushions in the range of 20% adequately protect creditors.  In re Mellor,  734 F.2d 1396, 1401 (9th Cir. 1993) (finding that lender was adequately protected where a 20% equity cushion existed, and favorably citing to

Page 9 of 15 -    DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

cases holding that 10% to 20% equity cushions are sufficient).   Textron is protected from a

total loss of the $2,383,183[2] of cash collateral that Debtor is requesting authority to use, let

alone any amount of erosion in the value of the cash collateral that can reasonably be

argued will occur in the 28 days ending September 28, 2009.

Larry Teufel's declaration establishes that the reasonable forecasted erosion related

to the cash collateral may be approximately $116,106.  (Teufel Declaration at p.11)

Textron has not quantified the rate of erosion, and at his deposition Mr. Morse (Textron's

senior vice-president) admitted that he did not know how to quantify the erosion rate.

B.    Textron's Own Valuations Show That Adequate Protection Exists

Textron argues that no value for the Holly Farms real property can be included in an

adequate protection analysis.  Textron's sole authority for this remarkable proposition is In

re Kenny Kar Leasing, Inc., 5 B.R. 304 (Bankr. C.D. Cal. 1980).  However, even a cursory

reading of that case shows that it stands for the exact opposite proposition.  In that case,

the court considered whether an unsecured guaranty by a third party constituted adequate

protection for a secured creditor.  The court undertook to evaluate exactly what rights the

guaranty provided for the secured creditor, and determined that in that case, a right to

proceed in an action against a third party, whose assets were of uncertain value, was

insufficient to provide adequate protection, and could not be considered a replacement lien

for the purposes of Section 361.  In the course of its analysis, the court explicitly stated if

---

[2] It is worth noting that using Textron's valuations, the accounts receivable are worth $1,675,229, or less than the amount of receivables Debtor asks to use. This anomaly demonstrates how strained Textron's values are in its effort to torpedo this Debtor.   Therefore, despite the fact that Debtor is requesting authority to use $2,383,183 of cash collateral, Textron should be satisfied by adequate protection of at most $1,675,229, as Textron does not seem to believe that the value of the cash collateral exceeds $1,675,229.

Page 10 of 15 -   DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

the guaranty were to be treated as a lien, "the guaranty may well constitute adequate

protection." Id. at 306.  Indeed, the fact that the court in Kenny Kar Leasing even

undertook to analyze the guaranty is evidence that the California Court believed that

property provided by a third party could be evaluated and considered as part of a secured

party's adequate protection.

The case before the Court today concerns a perfected lien on non-debtor real estate

with significant equity.  There is nothing in the language of Section 361, nor in any case

that Debtor's counsel can find in the course of its research that requires adequate

protection be limited to property of the debtor or the estate.  11 U.S.C. § 361.  If there were

such a case, we can assume that Textron would have provided it.  Textron's proposed rule

that adequate protection is limited to estate property would lead to the absurd result that

related entities or shareholders of debtor entities would be unable to provide payments or

liens to satisfy the requirements of Section 361, and effectively gut the protections that

Section provides for both creditors and debtors alike.

Textron also argues that in this case a large equity cushion should be required.  To

make this argument, Textron relies on two lines of cases.

In the first, the court held that when considering a motion to use cash collateral it is

appropriate to consider whether the debtor has any reasonable chance of reorganizing

prior to analyzing the extent to which the creditor is adequately protected.  In re American

Sweeteners, Inc., 2000 Bankr. LEXIS 788 at *17 (Bankr. E.D. Pa. July 14, 2000).

However, the court's ruling in American Sweeteners involved a debtor that had been in the

bankruptcy case for nearly a year, and that had submitted a plan of reorganization that the

court found to be unrealistic.  The holding of American Sweeteners, which was based on

the court's finding that the debtor did not have a reasonable chance to reorganize after

Page 11 of 15 -  DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S
MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

nearly a year in bankruptcy, is completely inapplicable to the instant motion, where the

Debtor has been in bankruptcy for only 70 days and has another 50 days to file a plan per

order entered by the Court. Textron cannot convert a motion to use cash collateral within

the first 70 days of the bankruptcy case into a trial on the feasibility of Debtor's

reorganization.

The second line of cases Textron relies upon hold that where a debtor's activities

will result in the erosion of collateral, even a large equity cushion may be insufficient to

provide adequate protection. See U.S. Ass'n of Texas v. Timbers of Inwood Forest

Associates, 485 U.S. 365 (1988); In re Sharon Steel Corp., 159 B.R. 165 (Bankr. W.D. Pa.

1993). Those cases might be relevant to a determination of this motion if Textron had

made any concrete allegations whatsoever that its collateral position would materially

deteriorate over the 28 days ending September 28, 2009. Instead, Textron merely points

to a liquidity problem that Debtor is experiencing, and states that as a result of these

difficulties the value of its collateral will "shrink." Textron Opp. at 17. Textron fails to state

which collateral it believes will "shrink", and in what amount. Textron presents no evidence

to show that the Holly Farms property will depreciate during September, or that Debtor's

inventory, or machinery and equipment will depreciate during that month, or that Debtor's

accounts receivables will deteriorate beyond the nearly 80% discount rate Textron already

applies to gross receivables. The purpose of adequate protection is protect a creditor

from depreciation of its collateral. In re Weinstein, 227 B.R. 284, 296 (B.A.P. 1998).

Without presenting any evidence that its collateral will depreciate during September, the

only time period affected by this motion, and in what amounts, Textron cannot prevail on

an argument that an equity cushion cannot provide adequate protection. Larry Teufel's

Declaration establishes that a reasonable estimate of the possible erosion is only

**Page 12 of 15** - DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S
MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

approximately $116,106, (Teufel Declaration at p.11) calculated as follows:

| DESCRIPTION | AMOUNT |
|---|---|
| Cash | $92,027.00 |
| Real Estate | $0.00 |
| Equipment | $7,100.00 |
| Inventory | $16,979.00 |
| Accounts Receivable | $0.00 |
| Maintenance Division | $0.00 |
| TOTAL: | $116,106.00 |

Against that possible erosion Textron holds an equity cushion exceeding $10 million. Textron is wasting the Court's time and the Debtor's money with Textron's ridiculous argument of lack of equity cushion under these facts.

C.    Other Relief Is More Appropriate Than Simply Refusing To Authorize Debtor To Use Cash Collateral

Even if the court were to find that the present equity cushion is insufficient to protect Textron from diminution in the value of its cash collateral, such a finding does not mandate that the case be dismissed or converted to Chapter 7. Rather, the court has great discretion to allow the debtor to propose alternative means of adequate protection, particularly where a conversion to Chapter 7 would cause a huge loss of value which could otherwise be preserved for the benefit of the creditors of the bankruptcy estate and would result in the loss of over 300 jobs in the Portland community.  If the Court should find the present equity cushion insufficient then the Court should decide if there are other available options which would adequately protect Textron and be in the best interests of the estate, including but not limited to the following two proposals:

First, the Court could provide a short opportunity for the Debtor, its affiliates and its

Page 13 of 15 -  DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S
MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

shareholders to post additional collateral in an amount the Court determines sufficient to adequately protect Textron for use of its cash collateral. Because the Debtor believes that Textron is more than adequately protected at the present time, no offers of additional collateral have been made as such offers could narrow Debtor's options in a future reorganization, to the detriment of the estate at large.

Second, the Court could shorten the deadline for Debtor's submission of a plan, or direct Debtor to submit a specific type of plan on an expedited time line, such as a plan for orderly liquidation. The Debtor will present evidence at the hearing that will demonstrate that a plan providing for a partial or complete orderly liquidation would adequately protect Textron's position during the implementation of the plan and would preserve huge amounts of value for Textron and for the bankruptcy estate when compared to a forced liquidation. The affidavits submitted by Textron's valuation experts (which Debtor disputes as incomplete and inaccurate), if believed, show that Textron's blanket lien would be insufficient to pay Textron in full in a forced liquidation, with the result that essentially no other creditors would receive any distribution in a liquidation under Chapter 7. The court should not sacrifice the employees and creditors merely to appease Textron's desire to exit from the asset based lending business.

## IV. <u>CONCLUSION</u>

Using the correct valuation methods, and including all of the assets that Textron is secured by, it is apparent that Textron is adequately protected from the threat of any loss of cash collateral in the 28 days ending September 28, 2009. Textron's objection to Debtor's use of cash collateral fails to quantify the amount of any reasonably foreseeable diminution in the value of the cash collateral. The evidence presented by the Debtor will show that any reasonably foreseeable diminution in the value of the cash collateral during

Page 14 of 15 - DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
VANDEN BOS & CHAPMAN, LLP
Attorneys at Law
319 SW Washington Street, Suite 520
Portland, Oregon 97204-2690
(503) 241-4869

the 28-day period for which it is requested is minimal, and Textron is well protected by an

equity cushion greatly in excess of any reasonably foreseeable diminution in the value of

the cash collateral.  The Court should grant Debtor's motion to use cash collateral.

Respectfully submitted;

VANDEN BOS & CHAPMAN, LLP


By:/s/Robert J Vanden Bos
    Robert J Vanden Bos, OSB #78100
    Of Attorneys for Debtor-in-Possession

**Page 15 of 15 -**  DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S OPPOSITION TO DEBTOR'S
         MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL
                        VANDEN BOS & CHAPMAN, LLP
                              Attorneys at Law
                      319 SW Washington Street, Suite 520
                         Portland, Oregon 97204-2690
                              (503) 241-4869

se


se
07/26/02   FRI 15:08 FAX   Case 09-34880-elp11 JUDGE BROWN   Filed 08/21/09          ☒002

se
CLERK. U.S. BANKRUPTCY COURT
DISTRICT OF OREGON

JUL 2 6 2002

LODGED:_____ REC'D_____
FAI:_____ DOCKETED ☒

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF OREGON

TRISH M. BROWN
BANKRUPTCY JUDGE

1001 S.W. FIFTH AVENUE, # 700
PORTLAND, OREGON 97204
(503) 326 - 4961

NANCY C. ANTAL
LAW CLERK

SUZANNE M. MARX
JUDICIAL ASSISTANT

July 26, 2002

## VIA FACSIMILE AND FIRST-CLASS MAIL

Robert J. Vanden Bos
Vanden Bos & Chapman, LLP
Suite 520, The Spalding Building
319 SW Washington Street
Portland, OR 97204-2690

Scott L. Jensen
Melissa S. Wandersee
Brownstein, Rask, Sweeney, Kerr,
 Grim, DeSylvia & Hay, LLP
1200 SW Main Street
Portland, OR·97205-2040

Martin P. Meyers
Sussman Shank LLP
1000 SW Broadway Street, Suite 1400
Portland, OR 97205

Pamela J. Griffith
Office of United States Trustee
620 SW Main Street, Suite 213
Portland, OR 97205

Teresa H. Pearson
Miller Nash LLP
111 SW 5th Avenue, Suite 3500
Portland, OR 97204

Re:    Leon S. Eichler and Terri L. Eichler, Case No. 301-40539-tmb11

Dear Counsel:

This matter came before the court on July 11, 2002, on a hearing on confirmation of the Debtors' First Amended Plan of Reorganization as amended by their Motion of July 8, 2002 (the "Plan"). The Debtors were represented by Robert J. Vanden Bos. Bank of America (the "Bank") was represented by Martin P. Meyers. Farm Credit Leasing Services, Inc., was represented by Teresa H. Pearson and Hub Farms, Inc., was represented by Melissa S. Wandersee. Following the hearing I took the matter of confirmation under advisement.

I have reviewed my notes, the exhibits, and the pleadings and other submissions in the file. I also have read applicable legal authorities, both as cited to me and as located through my own research. I have considered carefully the oral testimony and arguments presented and have read counsel's submissions in detail. The following findings of fact and legal conclusions

se
EXHIBIT A
Page 1 of 1

Robert J. Vanden Bos
Martin P. Meyers
Teresa H. Pearson
Scott L. Jensen
Melissa S. Wandersee
Pamela A. Griffith
July 26, 2002
Page 2

constitute the court's findings under Federal Rule of Civil Procedure 52(a), applicable in this
proceeding under Federal Rule of Bankruptcy Procedure 9014.

## CONFIRMATION STANDARDS

The requirements for confirmation of a chapter 11 plan of reorganization are set forth in
§ 1129 of the Code. The court has an affirmative duty to make sure that all of the requirements
for confirmation are met. In re Ambanc La Mesa Ltd. Partnership, 115 F.3d 650, 653 (9th Cir.
1997). The court will confirm a plan only if the plan proponent proves by a preponderance of the
evidence that either 1) all 13 requirements of § 1129(a) have been met, or (2) if the only
condition to confirmation that is not satisfied is § 1129(a)(8), that the plan satisfies the standards
for "cramdown" under § 1129(b), i.e. that the plan "does not discriminate unfairly" against and is
"fair and equitable" with regard to each impaired class that has not accepted the plan. Id.

## PLAN AMENDMENTS

At the time of the confirmation hearing, the Debtors moved to amend the Plan pursuant to
11 U.S.C. § 1127(a) and Bankruptcy Rule 3019. I find that the proposed modifications do not
adversely change the treatment of the claim of any creditor who has not accepted the
modifications in writing and , therefore, the modifications shall be deemed accepted by all
creditors who have previously accepted the Plan.

## BALLOT SUMMARIES

All voting classes of impaired creditors voted to accept this plan except the Bank, the
Debtors' largest secured creditor.

## UNCONTESTED ISSUES

At the confirmation hearing, no issues were raised as to the Debtors' Plan satisfying the
requirements of § § 1129(a)(4), (5), (9), or (12). Consequently, I find, consistent with the
testimony of Mr. Eichler and the evidence presented, that the requirements of § § 1129(a)(4), (5),
(9) and (12) have been met. In addition, it is uncontested that the requirements of § § 1129(a)(6)
and (13) are inapplicable in this case.

## COMPLIANCE OF PLAN WITH TITLE 11

Section 1129(a)(1) provides that the court may not confirm a plan unless it finds that the
plan complies with the applicable provisions of Title 11.

At the time of the confirmation hearing, the Debtors had approximately $580,000 in
cash which they had acquired from the sale of inventory and equipment subject to liens held by

Robert J. Vanden Bos
Martin P. Meyers
Teresa H. Pearson
Scott L. Jensen
Melissa S. Wandersee
Pamela A. Griffith
July 26, 2002
Page 3

the Bank. These funds are subject to a valid, perfected first priority security interest in favor of the Bank.

The Debtors' Plan provides that so long as they are not in default under the Plan, they may use this cash collateral to make the payments required under the Plan and in the ordinary course of their business. In addition, the Plan allows the Debtors to sell the remaining equipment subject to the Bank's lien and retain up to $100,000 of the proceeds from those sales rather than paying all the funds over to the Bank.

The Bank, citing § § 363 and 506(c) contends that the Debtors may not "as a matter of law" use the proceeds of the sale of its collateral to fund their post petition operations. Consequently, it contends that the Debtors' Plan does not meet the applicable requirements of Title 11 and may not be confirmed.

Section 363 governs a debtor's post petition use of property in which a creditor holds a security interest. The Bank concedes that, as a general rule, a debtor may use cash collateral post confirmation provided the rights of the entity with an interest in the cash collateral are adequately protected. See, e.g. In re Coventry Commons Associates, 149 B.R. 109, 114 (Bankr. E.D. Mich. 1992) in which the court allowed the debtor's post petition use of rents in which a creditor held a security interest.[1]  The Bank argues however, that the use of cash collateral proposed by these Debtors is "distinguishable from the situation where a secured creditor's inchoate lien rights to rental income is retained post-confirmation, even though presently available rental proceeds are allowed to be used in the reorganization [since] a secured creditor in the latter situation will again be able to collect rents should a default occur" whereas it "will forever lose its liens on the equipment sold by the Debtors."

---

[1]     Judge Rhodes states: "This Court begins with the proposition, affirmed by the District Court in this case, that under § 363, a debtor is entitled to use property in which a creditor has a security interest if that interest is adequately protected. 11 U.S.C. § 363 (1989). This unremarkable principle applies both pre-confirmation and post-confirmation. If the mere fact that the debtor's property was subject to a security interest meant that it had to be used to pay off the secured creditor's claim, there would be no Chapter 11. All secured property would have to be surrendered to the secured creditor in payment of the debt. Indeed, potential debtors would have substantial difficulty in obtaining counsel if the debtor were required to pay an undersecured creditor all of its available cash. The Court concludes that such cannot be the law, and to the extent that Travelers argues that all of its collateral, even its cash collateral, must be used to pay its debt, the Court rejects that argument. The Court specifically rejects Travlers' contention that United Sav. Ass'n v. Timber of Inwood Forest Assocs., 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) requires such an absurd result. Coventry Commons, 149 B.R. at 114.

EXHIBIT A
Page 3 of 11

Robert J. Vanden Bos
Martin P. Meyers
Teresa H. Pearson
Scott L. Jensen
Melissa S. Wandersee
Pamela A. Griffith
July 26, 2002
Page 5

The post confirmation debt to the Bank will be secured, in part, by Farm A. That property encompasses 84.7 acres. There is a residence on the property and two mobile home sites as well as 8 hay storage barns. The barns are fully enclosed. Most have concrete or asphalt floors. They have the capacity to hold approximately 22,000 tons of processed hay. In addition, there is a storage building which can hold about 1,000 tons. This building was used by the Debtors to store grass seed.

Mr. Eichler testified that he had a firm contract to lease barn space for 4,500 tons of straw hay at a price of $10.00 per ton to Mr. Rod Phelan. He felt that the remainder of the capacity could be rented for $10 a ton due to the nature of his barns. However, for this year, the Debtors would use much of the storage capacity.

Mr. Eichler further testified that he had previously rented a one quarter of the seed storage facility for $5,000 for three months. He testified that he believed a realistic long term rent for the seed storage building was between $10,000 and $20,000 per year. Also this building could be used for hay storage.

Mr. Rutherford, a state certified appraiser, testified for the Bank regarding the value of Farm A. Mr. Rutherford had appraised Farm A in April 2001 at the Bank's request. He used three methods to determine the value of the property, the cost approach, the income approach, and the market approach. At the time of the appraisal, Mr. Rutherford gave the greatest weight to the value established by the market approach, stating that "the Market approach reflects the actions and thinking of buyers and sellers of this type of property [and thus] there is a high degree of confidence in [that approach]". He gave the least weight to the income approach.

At the confirmation hearing, Mr. Rutherford stated that he originally valued the property at $1,711,000 based on his determination that the market value approach was the best indicator of the value of the property. He updated that number to $1,750,000 in November 2001. He arrived at this conclusion based on the assumption that the property, which at that time was being used as a hay compressing and storage facility with at least one hay compressor on site, would continue to be used for that purpose. However, he stated that he had been advised that the hay compressors had recently been removed from the property and sold.[2] He stated that if no compressors were on the property then, in his opinion, the market approach was no longer the best method for determining the value of the property and that it should, instead, be calculated based on the income approach.

Mr. Rutherford testified that the using the income approach the property had a value of $1,553,378.00. He arrived at this value by calculating rental income for the property, including income from the residence, the mobile home sites, the crop land acreage and the hay storage

---

[2]     However, the Debtor's testimony was that although one hay compressor had been sold, one remained on the property.

EXHIBIT A
Page 4 of 11

Robert J. Vanden Bos
Martin P. Meyers
Teresa H. Pearson
Scott L. Jensen
Melissa S. Wandersee
Pamela A. Griffith
July 26, 2002
Page 6

barns. He calculated the income from the hay storage barns based on the assumption that this space could be rented for $7.50 per ton. He conceded that if the actual rental income from the buildings was $10.00 per ton, the amount the Debtors are to receive under their recently executed contract with Mr. Phelan, that the value of the property, using the income approach, would increase to $2,017,822 and as much as $2,218,377 if the grass seed building was leased for $20,000. I find the Debtors' contract at $10.00 per ton to be the best indicator of the market for the Debtors' specific hay storage barns. Therefore, I find that the value of Farm A is between $1,750,000.00, the value established by Mr. Rutherford under the market approach, and $2,218,377.00, the value established by Mr. Rutherford under the income approach, using a figure of $10 per ton income for the storage space of the barns and the grass seed building.

In addition to Farm A, the Bank also has a security interest in most of the Debtors' farming equipment. The fair market value, as of the date of the confirmation hearing of the equipment in which the Bank holds a security interest was $1,115,390.00. The value, assuming an "orderly liquidation" was $656,190.00. The Debtors propose to keep $100,000 from the sales of the equipment post confirmation. Consequently, if the Plan is confirmed, the Bank's post confirmation collateral, using the liquidation value for the equipment, less the $100,000, would be between $2,306,190.00 and $2,874,567.00. Thus, following confirmation the Bank would have an equity cushion equal to at least 49% of its total debt. Given these facts I believe that the Bank's interest is adequately protected by the Debtors' proposed Plan despite the fact that the value of its collateral may be reduced by the Debtors' post confirmation use of it. Consequently, I find that the Plan does not violate § 363 of the Code.

Section 506(c) provides that "the trustee [or debtor-in-possession] may "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property [but only] to the extent of any benefit to the holder of such claim." In other words, this section allows a debtor to require that a secured party bear the costs associated with its collateral, provided that those costs were reasonable and necessary and of benefit to the secured party.

In this case, the Debtors are not asking that the Bank bear any of the costs associated with its collateral. On the contrary, the Debtors' Plan provides for payment of the Bank's claim in full with interest. Consequently, since the Bank's interest is adequately protected, the Debtors' use of its collateral, does not constitute a surcharge against the Bank and does not violate § 506(c) of the Code. See In re Coventry Commons Assocs, 149 B.R. 109, 114 (Bank. E.D. Mich. 1992). I find, therefore, that the Debtors' Plan complies with the applicable requirements of title 11 and, therefore, complies with § 1129(a)(1).

## PROPONENT'S COMPLIANCE WITH TITLE 11

Section 1129(a)(2) prohibits the court from confirming a plan unless it finds that the proponent has complied with the applicable provisions of Title 11. The Bank contends that the

Robert J. Vanden Bos
Martin P. Meyers
Teresa H. Pearson
Scott L. Jensen
Melissa S. Wandersee
Pamela A. Griffith
July 26, 2002
Page 7

plan proponents in this case have failed to meet that standard. However, they presented no evidence or testimony to support that contention. Accordingly, I find that the Plan meets the requirements of § 1129(a)(2) in that the plan proponents have complied with the applicable provisions of Title 11.

## GOOD FAITH

Section 1129(a)(3) provides that the court may not confirm a plan unless it has been filed in good faith and not by any means forbidden by law. The Bank contends that the Debtors' plan was not filed in good faith because they are "attempting to push-start a new and untested revised business model that is not viable under Debtors' own calculations [and that the] Debtors' revised business model has nothing to do with Debtors' essential job of liquidating the Bank's collateral and paying the Claim."

"Good faith [in proposing a plan of reorganization] requires that a plan will achieve a result consistent with the objectives and purposes of the Code. In re Jorgensen, 66 B.R. 104, 109 (9th Cir. BAP 1986). "It also requires a fundamental fairness in dealing with one's creditors." In re Stolrow's Inc.. 84 B.R. 167, 172 (9th Cir. BAP 1988). The Bankruptcy judge is to assess the good faith of the proponent of the Plan under the "totality of the circumstances." In re Boulders on the River, Inc., 164 B.R. 99, 104 (9th Cir. BAP 1994), Stolrow's, 84 B.R. at 172.

Under the Debtors' Plan classes one through 14 are comprised of creditors holding secured claims. With the exception of the Bank and Hub Farms, Inc., all Classes of secured debt except Four, Five, Six, Ten and Thirteen have been paid in full or will be paid in full within 10 days of the Effective Date of the Plan. Debtors will cure any defaults with respect to classes Four, Five, Six, Ten and Thirteen and resume payments to those creditors in accordance with the terms of the original agreements between the parties. The Plan modifies the rights of the Class Nine creditor, Hub Farms, Inc., by extending the due date on the debt owed to it by two years from April 1, 2004, to April 1, 2006. However, all sums due to Hub Farms, Inc. will be paid in full, with interest by that date. All unsecured creditors, except Mr. Eichler's mother, will be paid in full, with interest at the federal judgment rate, within 10 days of the Effective Date of the Plan. Mr. Eichler's mother will also be paid in full, with interest accruing at 6 percent interest. However, her claim will be paid in monthly installments.

It is important to note every creditor will be paid in full with interest. A portion of the funds allowing the Debtors to do so comes from a $1,000,000 inheritance that arose after the filing. This unexpected infusion of cash has insured the Debtors the proverbial "fresh start" in this case.

With respect to the Bank, whose interests are adequately protected both by the interim plan payments and its equity cushion, the Plan provides that it shall have relief from the confirmation injunction to foreclose on its collateral, without application to or further order of

Robert J. Vanden Bos
Martin P. Meyers
Teresa H. Pearson
Scott L. Jensen
Melissa S. Wanderser
Pamela A. Griffith
July 26, 2002
Page 8

the court, if it is not paid in full within two years of the effective date of the plan. Consequently, I
find that the Debtors' Plan is consistent with the objectives of Title 11.

The fact that the Debtors propose to use the Bank's cash collateral to fund their Plan does
not change this conclusion. The purpose of a Chapter 11 proceeding is to allow a debtor to
reorganize, usually using an untested revised business model, while delaying payments to
creditors. Here, however, the testimony was that the Debtors are continuing a portion of their
business they have operated for over 20 years. What has changed is that the Debtors cut back on
some of the operations, namely the hay compressing and exporting to foreign markets portion of
the business. There was absolutely no evidence or indicia that the Plan was not filed in good
faith. Consequently, I find that under the totality of the circumstances the Plan was filed in good
faith and meets the requirements of § 1129(a)(3).

## BEST INTERESTS OF CREDITORS

Section 1129(a)(7) prohibits the court from confirming a plan unless it finds that each
class of impaired creditors has accepted the plan or will receive as much under the plan as it
would receive in a hypothetical Chapter 7 liquidation. All impaired classes have accepted the
Plan except the Bank. Consequently, in order to find that the Plan meets the requirements of §
1129(a)(7) I need only find that the Bank will receive as much under the Plan as it would receive
if the Debtors' assets were liquidated in a Chapter 7.

The Debtors' Plan provides for full payment of the Bank's claim within 18 months of the
effective date of the Plan. The Bank's treatment is outlined above. The Bank's own appraiser
indicated it would take a year to market Farm A. Debtors have already begun marketing Farm A
for $1,750,000.00. There was no evidence that if the Bank were allowed now to file its own Plan
that it would receive payment any faster. Keeping in mind that there are many other creditors
who will be paid on the Effective Date, any further delay will be detriment to those creditors and
to the Debtor who will have to pay additional interest to those creditors and to the Bank.
Contrary to the Bank's assertion, it is not the Debtors' "essential job" to liquidate the Bank's
collateral. If that were the case, there would never be reorganizations only liquidations in
Chapter 11. I find that the Bank will receive as much under the Debtors' proposed Plan as it
would receive if the Debtors' estate were liquidated under Chapter 7 of the Code and that the
plan, therefore, meets the requirements of § 1129(a)(7).

## ACCEPTANCE BY IMPAIRED CREDITOR CLASSES

Section 1129(a)(8) provides that the court may only confirm a plan if each class of
impaired creditors has accepted the plan. In this case the Bank, an impaired creditor, has not
accepted the Debtors' proposed Plan. Thus, the requirements of § 1129(a)(8) have not been met.

Robert J. Vanden Bos
Martin P. Meyers
Teresa H. Pearson
Scott L. Jensen
Melissa S. Wandersee
Pamela A. Griffith
July 26, 2002
Page 9

## ACCEPTANCE BY ONE CLASS OF IMPAIRED CREDITORS

Section 1129(a)(10) provides that a plan may not be confirmed unless at least one class of impaired creditors has accepted the plan. In this case, all classes of impaired creditors except the Bank have accepted the Plan. Accordingly, I find that it meets the requirements of § 1129(a)(10).

## FEASIBILITY

Section 1129(a)(11) prohibits confirmation of a plan unless the court finds that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan. "The purpose of section 1129(a)(11) is to prevent the confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." In re Pizza of Hawaii, Inc., 761 F.2d 1374, 1382 (9th Cir. 1985). However, guaranteed success of a Chapter 11 plan is not the standard for confirmation under § 1129(a)(11). In re The Prudential Energy Co., 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986). Rather, "[a]ll that is required is that there be reasonable assurance of commercial viability." Id. "The key element of feasibility is whether there exists a reasonable probability that the provisions of the plan of reorganization can be performed" and "a relatively low threshold of proof [will] satisfy the feasibility requirement." In re Sagewood Manor Assocs. Ltd. Partnership, 223 B.R. 756, 762-63 (Bankr. D. Nev. 1998).

Bill Kristy, one of the Bank's vice presidents, testified for the Bank regarding the feasibility of the Debtors' proposed Plan. He testified that under the Plan the Debtors will have a negative cash flow in both 2002 and 2003 and that their cash flow in 2004 will be positive only if they terminate their bookkeeper who receives a salary of $39,000 per year. However, the Bank's financial projections did not include income from the rental of the storage facilities on Farm A and did not take into effect the fact that the Debtors could, if necessary to ensure feasibility, cease payment of a $36,000 per year life insurance premium covering Mr. Eichler's father. If these factors are taken into account, the Debtors can show a positive cash flow through out the life of their Plan.[3]

The success of the Debtors' Plan depends, in large part, upon the sale of Farm A and the use of the proceeds of that sale to pay the Bank's claim and further liquidation of excess equipment. There was no evidence that the Debtors are not motivated to sell Farm A nor that the Bank could do a better or faster job of selling Farm A. There was no evidence that Scott Riley, an associate broker with Century 21, and one of the Debtors' selling agents, wasn't knowledgeable about farm sales. Currently, three agents and an assistant are working on the

---

[3]     Moreover, there is possibly room for the Debtors to reduce their own draws ($60,000 per year) should that become necessary.

EXHIBIT A
Page 8 of 11

Robert J. Vanden Bos
Martin P. Meyers
Teresa H. Pearson
Scott L. Jensen
Melissa S. Wandersee
Pamela A. Griffith
July 26, 2002
Page 10

sales. The Bank presented no evidence that 1) Century 21 agents were unqualified or unable to sell Farm A; 2) that the Bank would use a different marketing approach; 3) that the Bank was unhappy or dissastisfied with the Debtors' choice of or selling agents; and 4) that the Bank could achieve a sale of Farm A any faster than the Debtors. Under the Plan , Farm A is to be sold within 18 months of the Effective Date of the Plan. Even if the Debtors have to reduce the purchase price to sell Farm A. a sale will either pay the Bank in full or nearly so. In his appraisal, Mr. Rutherford stated that he believed that Farm A could be sold within one year of its exposure to the market. Mr. concurred in that opinion. Consequently, it appears that the Debtors' proposal to sell Farm A within 18 moths of the effective date of the Plan is reasonable. Given these facts, I find that the Debtors' Plan is feasible and, therefore, satisfies the requirements of § 1129(a)(11).

## CRAMDOWN

The Debtors' proposed Plan complies with all of the requirements of § 1129 except those contained in § 1129(a)(8). Section 1129(b) provides that if all requirements of 1129(a) are satisfied other than § 1129(a)(8), a Chapter 11 plan may still be confirmed over the rejection of an impaired class of creditors if the plan is "fair and equitable" toward that class and does not unfairly discriminate against it.

### 1. Unfair Discrimination

The Bank argues that it is unfairly discriminated against under the Debtors' Plan because it is required to release its liens in certain collateral while no other creditor is required to do so. It is true that the Bank is the only creditor that is required to release part of its liens upon confirmation of the Debtors' Plan. However, a plan may discriminate among secured creditors and still meet the requirements for cramdown under § 1129(b)(2) provided that the discrimination is not "unfair."

In this case, I find that the Bank is not prejudiced by the requirement that it release a portion of its liens upon confirmation of the Debtors' Plan. Following the payments approved by the court on the eve of the confirmation hearing the Bank's secured claim will be approximately $1,547,065.00. It is secured by collateral with a value of between $3,233,767 ($2,218,377 + $1,115,390 - $100,000) and $2,306,190 ($1,750,000 + $656,190 - $100,000). Thus, the risks incurred by the Bank as a result of the release of a portion of its collateral are minimal. Additionally, I note that the terms for repayment of the debt owed to the Bank will be substantially reduced from the original terms under the Debtors' Plan whereas the terms for repayment of Hub Farms, Inc., a similarly situated creditor, is extended by two years. Accordingly, I find that the Debtors' Plan does not "unfairly" discriminate against the Bank. Consequently, the Plan may be confirmed over the Bank's objection if it treats the Bank fairly and equitably.

EXHIBIT A
Page 9 of 11

Robert J. Vanden Bos
Martin P. Meyers
Teresa H. Pearson
Scott L. Jensen
Melissa S. Wandersee
Pamela A. Griffith
July 26, 2002
Page 11

## 2. Fair and Equitable Treatment

Section 1129(b)(2)(A) provides that plan is fair and equitable as to a class of secured claims if it provides:

(i)(I) that the holder of such claim retain the liens securing such claims, whether the property subject to the liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claim; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holder of the indubitable equivalent of such claims.

Because under the Plan the Bank's liens will not continue in its cash collateral or in the proceeds of the sale of all of its collateral, the Bank argues, and I agree, that the Plan does not satisfy the requirements for fair and equitable treatment under Sections 1129(b)(2)(A)(i) or (ii). However, subsections (i) through (iii) are alternative provisions, only one of which must be satisfied to provide fair and equitable treatment to a class of secured creditors under the Bankruptcy Code. Thus, the Debtors' Plan may be confirmed, despite its failure to satisfy the requirements of § 1129(b)(2)(A)(i) or (ii) if the Plan provides the Bank with the indubitable equivalent of its claim.

## 3. Indubitable Equivalence

"Indubitable equivalence" is a pre-Bankruptcy Code concept first enunciated by Judge Learned Hand in In re Murel Holding Corp., 75 F.2d 941, 942 (2nd Cir. 1935). In that opinion, Judge Hand stated:

"It is plain that 'adequate protection' must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was



Robert J. Vanden Bos
Martin P. Meyers
Teresa H. Pearson
Scott L. Jensen
Melissa S. Wandersee
Pamela A. Griffith
July 26, 2002
Page 12

intended to deprive him of that in the interests of junior holders, unless by a substitute of the most indubitable equivalence."

The inclusion of the indubitable equivalency requirements in the Bankruptcy Code as setting a standard for cramdown has been interpreted by the 9th Circuit as requiring that plan provisions "clearly must both compensate for present value and insure the safety of the principal." In re American Mariner Industries, Inc., 734 F.2d 426, 433 (9th Cir. 1984).

As noted previously, the Debtors' Plan provides for the Farm A Loan to be brought current, for the Equipment Loan to be reduced to $500,000 principal, and for monthly payments to the Bank of $8,400 on the Farm A Loan plus interest only payments on the Debtors' Equipment Line Loan and for the Bank to receive the proceeds of sales of equipment in excess of $100,000. Its secured claim is to be paid in full, with interest, within 18 months of the Effective Date of the Plan. If the claim is not paid in full within two years of the effective date of the Plan the Bank is entitled to relief from the confirmation injunction without the need for application to the court or for court approval. The loan to collateral value of the Bank's claim will remain at approximately 49% throughout the life of the Plan.

In these circumstances, the Bank's collateral position would appear to be comfortable in terms of providing protection for its principal, and the plan clearly provides for the payment of its allowed secured claim at the contract rate of interest over a period of not more than 18 months. I find that this treatment satisfies the "indubitable equivalence" requirement of § 1129(b)(2)(A)(iii) and accordingly, provides fair and equitable treatment to the Bank as required for cramdown under § 1129(b).

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, I find the Debtors' Plan satisfies the requirements for confirmation under section 1129 of the Bankruptcy Code. Mr. Vanden Bos has prepared and submitted a form of Confirmation Order for my signature consistent with the holdings set forth in this letter opinion and that order will be entered forthwith.

Very truly yours,

Trish M. Brown

TMB/NCA/smm
G:\SUZANNE\Letters\Eichler\VandenBos.004.wpd

In re  Teufel Nursery, Inc.;
Chapter 11 Bankruptcy Case No. 09-34880-elp11

CERTIFICATE - TRUE COPY

DATE:        August 21, 2009

DOCUMENT:   DEBTOR'S REPLY TO TEXTRON FINANCIAL CORPORATION'S
            OPPOSITION TO DEBTOR'S MOTION FOR INTERIM ORDER
            AUTHORIZING USE OF CASH COLLATERAL

        I hereby certify that I prepared the foregoing copy of the foregoing named document and
have carefully compared the same with the original thereof and it is a correct copy therefrom and
of the whole thereof.

CERTIFICATE OF SERVICE

        I hereby certify that I served a copy of the foregoing on:

| | | |
|---|---|---|
| Teufel Nursery, Inc. | IKON Financial Services | Ky Fullerton |
| Attn:  Larry Teufel | Recovery & Bankruptcy Group | Umpqua Holdings Corporation |
| 100 SW Miller Rd. | 3920 Arkwright Road, Ste. 400 | 1 S.W. Columbia Street, Suite 1400 |
| Portland, OR  97225 | Macon, GA 31210 | Mail Code 030-14-SPAD |
| | | Portland, Oregon 97258 |
| Christopher J. Kayser | TriMet | |
| LARKINS VACURA LLP | Attn:  Tamara Lesh | Recovery Management Systems |
| 621 SW Morrison St., Ste. 1450 | Deputy General Counsel | Corporation |
| Portland, OR  97205 | 710 NE Holladay Street | 25 SE 2nd Avenue, Suite 1120 |
| | Portland, OR 97232 | Miami, FL 33131 |
| Bankruptcy Administration | | |
| IKON Financial Services | | |
| 1738 Bass Road | | |
| P. O. Box 13708 | | |
| Macon, GA 31208-3708 | | |

by mailing a copy of the above-named document to each of them in a sealed envelope, addressed to
each of them at his or her last known address.  Said envelopes were deposited in the Post Office at
Portland, Oregon, on the below date, postage prepaid.

The following were served electronically by the Court:

U.S. Trustee
Leo D. Plotkin
Richard J. Parker
Jan D. Sokol

        Dated:  August 21, 2009

                    VANDEN BOS & CHAPMAN, LLP


                    By:/s/Robert J Vanden Bos_____
                        Robert J Vanden Bos, OSB #78100
                        Of Attorneys for Debtor-in-Possession